MuffiN, C. J.
 

 In the latter part of the year 1835, the plaintiff and the defendant jointly purchased from one Lewis a number of slaves, at the price of $32,000; whereof one half was payable down, and the other half at a subsequent period, and in the mean time secured by the bond of these parties. Early in 1836, a sale was made of the same ne-groes to persons in Mississippi, for the sum of $50,000; whereof 15,000, was to be paid ata short day, and for the residue the purchasers were to give their bonds at one and two years. Both the plaintiff and the defendant were present, and united in making the contract for this sale; but before the cash payment or any other act was done under it, the plaintiff returned to this state and left the defendant to complete the arrangement by receiving the first payment, and getting the bonds for the others. Instead of doing so, the defendant made a new contract with the same purchasers, by which the price was to be $60,000, on a credit of one, two, and three years; and he took their bonds accordingly. On the 13th of February, 1836, the defendant, then in Mississippi, addressed a letter to the plaintiff at their residence in Caswell County, and therein informed him, that he expected to enter into a new arrangement with the purchasers, upon which he regretted that he could not consult the plaintiff, and as he could not know the
 
 plaintiff’s
 
 views, he stated, (without mentioning what changes were proposed) that if any material change should be adopted, it would be upon the responsibility of the defendant, who would hold himself bound to make good the original contract to the plaintiff. In the succeeding Spring, the defendant also returned to Caswell; and it was then agreed between the parties that the plaintiff would sell out his interest in the adventure to the defendant for the sum of $7,500, in ready money; the
 
 *81
 
 defendant being also bound to pay the bond for $16,000, to Lewis, and certain other debts lor the money borrowed, with which the first payment was made to Lewis.
 

 By the bill (filed in October, ] 838,) and by an amendment thereto, it is charged that the defendant at the time of making this contract concealed from the plaintiff the changes
 
 he
 
 had made in the sale oí the slaves, and that the plaintiff was ignorant thereof. It is charged, that at the time of making the contract, the sums, in which the parties were indebted, were, first, that of $16,000, to Lewis; and secondly $10,000, to a Bank in Danville in Virginia; and also that McAden was indebted to one Garland by bond for $4,300, which the plaintiff executed as his surety; and that it was a part of the agreement, that the defendant should not only assume the joint debts as his own, but should discharge them immediately, or should give new securities therefor, and thereby discharge the plaintiff from all liability lor any of those sums and for that due to. Garland. The bill further charges that the defendant failed to comply with the agreement in any re* spect, except that he paid {§6,000 to Lewis upon the bond to him; that when the plaintiff agreed to become the surety to Garland, he was told by the defendant, that the debt was only $2,400; and in that belief he executed a blank bond, which the defendant fraudulently filled up with the sum of g4,300.- That as the defendant did not pay the debt to the Danville Bank, at the maturity of the note, but was obliged to renew it, the plaintiff endorsed a note for the defendant’s accommodation to renew it: and that,- at the same time, the defendant, remarking that they could not al ways conveniently meet, and that the one or the other was often at a distance from home, requested the plaintiff to sign also another note in blank, to be used for a subsequent renewal; and, in confidence’that it would be used for that purpose and for no other, the plaintiff signed a blank as requested; which last note, however, the defendant filled up with the sum of $10,000, and thereon procured a new and further loan from the same bank. The bill further charges, that the defendant was largely indebted to other persons, and in the years, 1836 and-1837, was greatly embarrassed; and that the plaintiff,, finding.
 
 *82
 
 thus responsible for the defendant for sums amounting to about $35,000, became exceedingly uneasy, lest, from the ultimate inability of the defendant to discharge his debts, he, the plaintiff, should be obliged to pay the same or some part of them, and because his own credit was suspected on account of his liabilities for the defendant: That he communicated to the defendant his uneasiness, and his anxiety to be discharged from those liabilities by the defendant’s giving other sureties' instead of the plaintiff: That the defendant, being made thus aware of the plaintiff’s solicitude upon the subject, took advantage of the danger in which he had involved the plaintiff, and of his alarm thereat, and refused to give other security for the debts, or in any wise to indemnify the plaintiff, unless he, the plaintiff, would undertake to pay of those debts, the sum of $7,500, out of his own pocket, and lose the same entirely: and that the plaintiff, having failed,after many applications, to get any other relief, was, in June 1837, compelled to accept the terms proposed by the defendant; and in consideration that the defendant would give other sureties for the debts mentioned, and discharge the plaintiff, he, the plaintiff, executed his covenant to the defendant, thathe would pay upon the debt remaining due to Lewis, the sum of $7,500, and the defendant should be discharged from so much of that debt: That the plaintiff had paid $5,000, in part thereof, and was sued for the residue, and would be compelled to pay that also, unless the defendant should do so. The bill then expressly charges that the plaintiff’s covenant had no other consideration than that before set forth, namely: the agreement of the defendant to pay his own debts or otherwise to exonerate the plaintiff from his liability therefor (which the bill admits has been done;) and that the defendant was both legally and morally bound pay those debts and indemnify the plaintiff, without taking from the plaintiff his said covenant or any other of a like nature; and that the defendant ought, in conscience, now to make such payments,, notwithstanding the agreement aforesaid, which, the plaintiff insists is unreasonable and unjust, and ought to be set aside. The prayer of the bill is, that agreement may be rescinded, as being a hard and un
 
 *83
 
 reasonable bargain, and obtained by taking undue advantage of the state into which the plaintiff had been incautiously drawn by the defendant; and that the defendant may be decreed to pay to the plaintiff the sum already paid by him to Lewis, and to discharge him from the residue of the debt of $7,500. The answer admits the purchase and the sales of the negroes as before stated; and also the contract between the parties, whereby the plaintiff sold his interest to the defendant at $7,500, paid in the spring-of 1836. The answer admits that the defendant did not, before thiscontract, communicate to the plaintiff the particular terms of the second contract into which he had entered with the purchasers; but it states, that he did inform him, that the contract had been altered and left it to the plaintiff to sanction it and come into it, with its advantages and hazards as they might turn out, orto abide by the first bargain; and that the plaintiff insisted on holding the defendant liable for the first sale, but proposed to sell out to him for $7,500; which was agreed on. The answer then states, that immediately thereafter the defendant fully disclosed the terms of the second sale, and again
 
 left it to
 
 the option of the plaintiff to adopt that sale on their joint account, or to take the sum of $7,500, for his interest; and the plaintiff, with a perfect knowledge of all the circumstances, then declared his preference for the latter, and thereupon the contract was closed, and the money paid to the plaintiff and the defendant engaged to pay the price the parties were to give for the negroes. The answer admits that as between themselves, the defendant thereby became bound, as principal, for the debts of $16,000, to Lewis, and $10,000, to the bank in Danville, and that the plaintiff was bound therefor as surety only; and also that the plaintiff was the surety of the defendant to Garland, for 4,300. But it denies positively, that the defendant represented his debt to Garland to be only §2,400, or that the plaintiff signed a blank bond, and trusted to the defendant to fill it up; and avers that the plaintiff knew the true debt and executed his' bond jointly with the defendant to Garland after the bond was fully written. The answer also denies, that it was any part of that agreement, that the defendant should i
 
 *84
 
 mediately pay off those debts or discharge the plaintiff therefrom by giving other sureties or otherwise: and, on the contrary, it avers that the plaintiff was perfectly satisfied with ^ own Pro^ts 011 ^ie speculation, and also, with the defendant, believed that his profits upon that and other speculations would be large and that, consequently, the plaintiff ran no risk by being the surety for the defendant; and that the parties, accordingly through the year 1836, gave notes as surety for each other.
 

 The answer admits that the plaintiff endorsed notes in blank for the defendant, to be used in renewal of the note for $10,000, at the bank; and that one of those blanks was used, without the plaintiff’s knowledge, by way of renewing another note of defendant’s in the the same bank for the same amount. But it denies that this was done with a fraudulent intent, or that the plaintiff was in any jeopardy therefrom at the time the parties came to their agreement of June, 1837; and gives the following account of that transaction, namely: That the defendant owed two debts, of $10,000 each, to the bank; on the note for one of which, the plaintiff was the endorser; and the other, two other persons endorsed; one of whom was absent from home when his endorsement oí a note for renewal was needed: That to supply his place, the defendant’s agent used one of the notes, which the plaintiff had endorsed, with the intention, when it should be again renewed, to put in its place a note signed by the original sureties for that debt; as an officer of the bank said might be done. The answer states, that the defendant immediately informed the plaintiff of the transaction, and of-ferred to give him a full indemnity, if he required it, but the plaintiff said, he wished none, and was perfectly satisfied: That the original endorsers returned, and the defendant offered his note with their names on it, to take up that on which was the name of the plaintiff; but the bank re, fused, as it was its practice not to give up a good name: That then the defendant procured his father (who was fully able to pay the debt) to put his name on the note, as endorser, before the plaintiff’s, that thereby his liability might be prior to the plaintiff’s; and furthermore offered any indeni-
 
 *85
 
 nity against loss to the plaintiff from that note, which the plaintiff, professing to be satisfied with the responsibility of the defendant’s father thereon, again declined.
 

 The answer farther admits, that, besides the debts already mentioned, the defendant owed other debts to the amount of $40,000, for which various persons were his sureties. But it states that notwithstanding the large amount of his debts — * in all about $75,000 — he considered himself, and was considered by the plaintiff and all others, perfectly able to pay all his debts, and, that, after doing so, he would still be independent, until the Spring of 1837; when the purchasers of the negroes in Mississippi failed to make their first payment, and the general commercial embarrassment, derangement of the currency, and fall of property which then occurred, rendered it doubtful how far those purchasers could fulfil their contract, and certain that there would be a considerable loss on their debt. The answer admits, that this disappointment and others of a like kind, alarmed the defendant, his creditors. and sureties, and, among them, the plaintiff; and that the plaintiff in frequent interviews expressed to the defen. dant his claim, and his wish to be discharged from his liabilities or to be counter-secured. But the answer denies that the defendant did any thing to excite the plaintiff’s alarms, or that he refused to give every explanation in his power to satisfy his mind, or that he took any unfair advantage of his fears or anxiety. It admits it to be true, that the defendant was unable to raise money for the immediate discharge .of the debts, for which the plaintiff was bound; and that his other sureties, and also the defendant himself — who was desirous of dealing with equal fairness by all his sureties — were unwilling that the defendant should make an assignment of his estates for the separate benefit and protection of the plaintiff. But at the same time, the defendant laid before the plaintiff and his other sureties an accurate state of his affairs, upon which, unless the loss proved very great upon the south-western debts, there appeared more than sufficient assets to satisfy every creditor; and afterwards the plaintiffs fears appeared to be quieted under the prospect which seemed to him reasonable that the defendant
 
 *86
 
 would ultimately meet all claims upon him. But the answer states, the uneasiness of the plaintiff again and again revived, and his applications to the defendant to do something for his relief, were so incessant and urgent, that the defendant determined to make a general assignment of his estate and effects in trust to secure and pay all his debts, preferring, however, those for which any person was his surety, and putting all debts of that character on the same footing, with only the exception hereafter mentioned — and communicated that determination to his sureties, including the plaintiff. As to the exception alluded to, the answer states, that, as the defendant had paid to the plaintiff §7,500, as profit to him on their joint adventure, from which the defendant then, in 1837, would probably derive no profit, but sustain a heavy loss, he thought it just that, as to that sum the plaintiff should be regarded as a general creditor, and as such be secured in the deed of trust, and not as a surety; and therefore that, in the assignment, he would secure all the debts for which the plaintiff was liable as surety, namely, about §35,000, in the first class, except the said sum of §7,500; and as to that sum last mentioned, that it should be secured among the general debts, as a second class. But the plaintiff doubted whether a sufficient sum would be realized trom the defendant’s effects in a reasonable time to discharge the debts of the first class, as thus arranged; and feared he might sustain a loss on that part of the debt, over and above the said sum of $7,500; and besides, admitted that it was but reasonable that the whole loss of their adventure should not be thrown on the defendant. For which reasons the plaintiff preferred being discharged .at once and entirely from all the debt, for which he was bound, except that sum of §7,500; and therefore proposed that, if the defendant, instead of making the assignment as intended, would discharge him by giving other sureties for the debts, he, the plaintiff would apply to the payment of one of the debts, for which he was bound, the sum he had so received as profit, and would acquit the defendant therefrom. To this, the defendant says, he did not accede for some time; for the reasons, first, that by his contract with the plaintiff he had made the adventure
 
 *87
 
 his own, and wished to pay the whole debt, if his means should prove adequate as he hoped they would; and, second ly, because he was unable to discharge the plaintiff without involving other friends in loss in case his means should prove inadequate, and he did not know that he could procure other sureties, were he even willing to apply to any persons. But being repeatedly pressed upon the subject by the plaintiff, he finally assented to the plaintiff’s proposal, provided any per. sons would agree to become his sureties, whom the creditors would accept in the place of the plaintiff. The answer states^ that even, then the defendant assured the plaintiff, that he need not be uneasy,respecting the debt for $10,000, at the Bank, for which the note with the plaintiff’s endorsement had been substituted for another; because, from the manner in which the plaintiff was rendered liable for that debt, the defendant felt bound to provide for it at all events, and that he had the means of paying it at maturity, and intended so to do; and the answer states that he so did, without renewing it again. With respect to the residue of the debts aforesaid, the answer states that the defendant made sincere efforts to get his friends to become 'bound instead of the plaintiff; and that it was only after his own exertions for a fortnight, and frequent conferences between the plaintiff and the defendant’s other endorsers, and also with the defendant’s near relations, who were desirous to serve him, that it was finally arranged that his mother in law and two brothers in-law should assume the sum of $25,000 of his debts, including that for which plaintiff was liable;; and to induce them so to do, that the defendant should convey to them adequate property in this State as a security, and also that his father should become responsible lor other large debts which he owed; and that to this, another brother in-law, who was the defendant’s surety for $20,000 more, also assented, although he was not secured'by the assignment or otherwise, except by the personal responsibility of the defendant, and the prospect of collecting the debts in the west. The answer avers, that the defendant never would have entered into this arrangement, unless it had met the approbation of all his sureties, and unless thereby he had become the better enabled to meet the
 
 *88
 
 debts, for which his other friends were liable; and that neither those who were before bound for him, nor those who now became bound for him, would have approved of arranS'ement) or would have interposed in hisaffairs but for the belief, founded on the plaintiff’s representations, that he freely acquitted the defendant from that sum of
 
 $7.500]
 
 because he conceived it his interest to be disebarg-ed from his liability for the defendant even at that price, and because he thought it but just, under the circumstances, to refund that sum, which he had received as his share of the profits of a business, on which no profit was in truth made. The answer then states,- that in fact the defendant has been unable to collect the price of the negroes; and that from the insolvency of the purchasers, the loss on exchange, and various expenses, he has not merely made no profit (as is the case with the plaintiff,) but has sustained a loss of several thousand dollars: From all which it is probable the defendant will be so far unable to pay all his debts, that it was actually for the benefit of the plaintiff that he made the contract which the bill seeks to rescind. And the ansvver finally submits, that the plaintiff may still elect to set aside both of their last contracts, and stand upon the footing of partners with respect to the negroes, and of principal and surety in respect of the debts in question.
 

 To the1 answer replication was taken; but the plaintiffhas, taken no evidence. The defendant has examined two witnesses; one of whom was one of the sureties under the agreement of June 1837, for $25,816, for the defendant, in place of the plaintiff; and the other was McAden’s endorser for large sums without any indemnity. They prove that the agreement was not only consented to by the plaintiff, but was proposed by him, and urged upon McAden and the witnesses, as an act necessary to the credit of Gunn; and that it was- only after repeated interviews, that the witnesses and the other persons, who became bound for the defendant, reluctantly yielded their assent; which they did finally for the reason that McAden’s debts would be so much reduced, so that he would be the better able to meet the residue of his debts.- The property which he conveyed- has been sold for
 
 *89
 
 the payment of his debts; but he still owes debts, and it is generally believed, that he has probably been rendered insolvent by his losses on the speculation spoken of. .
 

 Although the circumstance, that the plaintiff had received a sum of money as the supposed profits of the partnership, may have been one of his motives for coming to the agreement, whereby he gave up that sum; yet the Court deems it unnecessary, in this case to take it into consideration. If he relinquish
 
 it
 
 because the business turned out unprofitably, and he thought it wrong to throw the whole loss on his associate, to his ruin; we do not see, that he could be re-leived from an act done with his eyes open, and which, if not required by conscience on his part, has, at least, nothing-in it against conscience on the part of the defendant. But this point is not relied on; for we think the bill cannot be sustained for other reasons. It may be inferred from the bill, and is established by the answer and proof, that through the year 1836, and early in* 1837, the defendant was regarded by himself and others as fortunate in business
 
 and on the high
 
 road of prosperity. During that period it was not considered, that responsibilities for him were hazardous. But it is equally clear, that, in the spring of 1837, a sad reverse in the defendant’s affairs suddenly occurred; and his career was then supposed to have ended in certain orprobableinsolveney. The plaintiff, being then bound in heavy sums for him, became alarmed; and, naturally, endeavored by various means to secure himself from loss. For that he was not to blame. He might with propriety have obtained, if he could, any of the securities which he asked. But, on the other hand, we see nothing in the conduct of the defendant on those occasions, that is to be censured. He was unable, by paying them, to discharge the plaintiff from the debts, for which he was bound: And he acted but justly by other persons, who were also his sureties, in refusing to make an assignment of property for the benefit of the plaintiff exclusively. He offered to make a general one, with the provisions mentioned in his answer; and no objection can be taken to those provisions, while a right is recog-' nised in a debtor to prefer one creditor before' another. Be
 
 *90
 
 sides, as the plaintiff had made a clear gain on the transactions, out of which arose the larger debts, for which he was responsible, the defendant, to the extent of the sum thus gained, might well distinguish between the plaintiff’s claim on him, and the merits of the residue of his claim on (hose of other persons, who had become bound for him, for his accommodation and without any interest of their own. Indeed, it does not appear, that the plaintiff objected to the terms of the proposed assignment, if that was to be the kind of security provided for him. But, for other reasons, he preferred a different mode. It is evident, the plaintiff had but little confidence, that the defendant could collect the large sums due for the negroes, without which he would, unquestionably, be insolvent; and, consequently, that he doubted whether the assignment would be a good security for the residue of the debt, after deducting the sum of $7,500. If that was not the state of his mind, it is inconceivable that he should not have eagerly embraced the offer of the assignment; which, according to its terms, would secure the whole debt, including the $
 
 7,500,
 
 if the estate and effects should prove of sufficient value. But in place of an assignment, the plaintiff proposed a different plan, as more advantageous to himself; and he urged it upon the defendant and his friends for days and weeks, until they yielded to his impor-tunities, and adopted it. Looking upon the defendant as unable to pay his debts, he felt heavily the burden of a liability for $35,000 of those debts, both as a present prejudice to his credit, and as a risk of an actual loss, ultimately, that would exceed $7,500 For that reason, it was, that the plaintiff offered to give up, at once, that sum of $7,500, if the defendant’s friends would, at once, exonerate him from the remaining sum of $27,500. If the plaintiff’s timidity had been practised on, and a fear of loss excited by falsehood or any unfair means, he would have an equity. But the bill does not allege nor intimate that the defendant’s embarrassments were not real, or that the plaintiff’s suspicions had been unduly alarmed by the defendant, directly or indirectly. There are indeed allegations that the plaintiff’s confidence had been abused by the improper use of notes, which
 
 *91
 
 he had signed in blank; so as to render him liable for more than he intended. But those allegations are either denied in the answer, or so explained as to shew that the plaintiff acquiesced in the only act admitted, and that he did not, in truth, suffer from that. We must, then, hold, that there was no imposition on the plaintiff respecting the defendant’s condition, arid that in June, 1837, it was, at the least, doubtful whether the defendant would be able to pay his debts, or how far short of it he would fall. Now, that being the case, we think it clear, that the agreement of the creditor or a surety to compound with the debtor for a smaller sum, promptly paid, or secured, by the debtor’s friends, is not an agreement without consideration, or hard and unreasonable; but that it is founded on considerations good in morals and law, and sufficient in this Court.
 

 Theplaintiff parted from a bad debt at more than its value; or, at-all events, for a doubtful debt at what was thought to to be its fair value. The payment by a debtor or his engagement to pay a smaller sum, will not discharge a debt for a larger sum, and the agreement to receive such smaller sum in satisfaction is but
 
 nudum factum.
 
 But, it is otherwise, when, besides the undertaking of the debtor, that of a third person is also given. Such an undertaking forms a new, distinct, and better security for the debt; and, therefore, is a satisfaction of the prior debt, when so received.
 
 Steinman
 
 v
 
 Magnus,
 
 11 East. 390. If this be so at law, much more is it in this Court. For, after the plaintiff has put to a severe trial the affections of the defendant’s family, and tortured the compassion of his friends and other sureties, until they were induced to assume $27,500, for which the plaintiff was liable, and to acquit him absolutely therefrom, upon condition that he would pay a residue of $7,500, for which also he was then bound, and which all parties supposed the defendant could not pay, it would be too much to say, that such an agreement was not as obligatory on the plaintiff as on the other parties. In taking on themselves debts for which the plaintiff had been liable, those persons thought they were buying the liberty of their distressed friend; that by diminishing his era-
 
 *92
 
 to the extent of the sum relinquished by the they were putting him in a way to exert himself anew, and by subsequent acquisitions to discharge other debts, ^or so.me °f them were also liable. They would never have bound themselves, but with those ends in view; and it would be a fraud in the plaintiff to frustrate them. Instead of the agreement being against conscience, and the defendant liable for this sum, notwithstanding the plaintiff’s discharge to him. it seems manifest, tiiat, if while the plaintiff was holding out the terms he did to the defendant’s friends, he had obtainded from the defendant his express promise, or any other security for the residue of his debt, the Court would not have allowed him to enforce it. It would clearly have fallen within the principle, on which contracts in fraud of compositions by creditors are avoided, If one creditor contrive to secure to himself better terms than he, with the other creditors, agreed to take, it is a fraud upon the other creditors; and neither at law, nor in equity, will the security be sustained, even against the debtor himself.
 
 Middleton
 
 v
 
 Onslow.
 
 I Pr. Wm. 768.
 
 Cockshett
 
 v
 
 Bennett,
 
 2 T. R, 763. Much less can the defendant be held liable for this money without any agreement on his part, and against th.e deliberate agreement and deed of the plaintiff.
 

 Between such persons the cases of hard and unreasonable bargains and of inadequacy of consideration, which were cited for the plaintiff, have no application. Here there is an adequate consideration; in the liabilities incurred by third persons, and also because, from the impending insolvency of the defendant, the plaintiff’s loss, but for this agreement, might have been, and probably would have been greater than $7,500, and thus the plaintiff derived from the .contract a direct pecuniary benefit.
 

 It was a hard bargain in no sense but the one, that every composition by creditors is hard on them. It is never submitted to but from necessity. But the plaintiff’s loss arose, or it was reasonably feared that it would arise, from the defendant’s insolvency; and not out of this agreement. The agreement may have prevented the loss from being greater.
 
 It
 
 was not an unreasonable composition, nor obtained by un
 
 *93
 
 due means. It was of the plaintiff’s proposing, with all the knowledge of his risks and of the defendant’s affairs, which the defendant himself had; was pressed by him for many days, and deliberately concluded by him, and, finally, was probably advantageous to him.
 

 The foregoing remarks also answer the cases of contracts with expectant heirs, wards, just of age, and between seamen and their captains or owners. The law extends to those persons peculiar protection, because they are considered as being in the power or under the influence of those, who thus deal with them. But, here the parties are reversed. A debtor may be often compelled by his creditor — -or his surety, having the authority of a creditor — to enter into unequal and oppressive contracts; from which he ought to be relieved. But it is not generally true
 
 vice verga)
 
 and the debtor can seldom compel terms agains.t the will of the creditor. And, in this particular case, the debtor, in fact, dictated no terms, and with difficulty, by the aid of his friends, complied with those insisted on by the plaintiff. The bill, therefore, stands simply on a principle, that, as a man ought to pay all his debts, a composition must, of necessity, and under all circumstances, be a harsh and unreasonable contract, and, as such be set aside; a doctrine altogether novel and unfounded? The bill must be dismissed with costs.
 

 Per Curiam, Bill dismissed with Costs.